THE EMERSON ELECTRIC MANUFACTURING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 61126. Filed August 30, 1957.

---

*William H. Charles, Esq.*, for the petitioner.
*Richard G. Worden, Esq.*, for the respondent.

OPINION.

MULRONEY, *Judge:* The respondent determined a deficiency in excess profits required to be paid into the Treasury under the provisions of the Vinson Act,[1] as amended,[2] for the year ended September 30, 1950, in the amount of $56,969.19.

The sole issue before us is whether excess profits on naval aircraft contracts may be offset by the deficiency in profit during the same taxable year on an Air Force aircraft contract or, in the alternative, the deficiency in profit in the same taxable year on a naval vessel contract.

The facts in this case were fully stipulated and are found accordingly. The following statement of stipulated facts will suffice to present the issues.

The Vinson Act, as amended, which will be the subject of a detailed discussion later in this Opinion, provides for a clause in the contracts for construction of naval vessels, naval aircraft, and Army aircraft,[3] whereby the contractors shall pay into the Treasury profit, in excess of 10 per cent of the contract prices for naval vessels, and profit in excess of 12 per cent of the contract prices for naval aircraft and Army aircraft. During the year ended September 30, 1950, petitioner completed 1 contract with a contract price of $2,743,488.38 for naval vessel, 5 contracts with total contract prices of $5,416,436.19 for naval aircraft, and 1 contract with a contract price of $1,738,799.63 for Air Force aircraft. Its net profit on the contracts was $122,316.92 for the naval vessel, $755,734.08 on the 5 naval aircraft, and $48,046.30 on the Air Force aircraft. By applying the Vinson Act percentages

---

[1] Act of Mar. 27, 1934, ch. 95, 48 Stat. 503, 505, referred to as the Vinson Act.

[2] Act of June 25, 1936, ch. 812, 49 Stat. 1926, referred to as the Act of 1936; and Act of Apr. 3, 1939, ch. 35, 53 Stat. 555, referred to as the National Defense Act of 1939.

[3] Now Air Force aircraft contracts. See sec. 305 (a) of the National Security Act of 1947, Act of July 26, 1947, ch. 343, 61 Stat. 495, 508, and Mim. 6340, 1949–1 C. B. 261.

it had a deficiency in profit on the naval vessel contract of $152,031.92, an excess profit on the 5 naval aircraft of $105,761.74, and a deficiency in profit on the 1 Air Force contract of $160,609.66.

Petitioner, a Missouri corporation with its principal office in St. Louis, filed its annual report of profit on Navy contracts and Army and Air Force contracts for the year ended September 30, 1950, with the then collector of internal revenue for the first district of Missouri. The report showed the above information with respect to petitioner's contracts for vessel and aircraft and petitioner set off in said report against the excess profit resulting in the performance of naval aircraft ($105,761.74), the deficiency in profit it sustained in the performance of the Air Force contract ($160,609.66) and, hence, petitioner paid no excess profits on its naval aircraft contracts.

Respondent determined that petitioner, in computing its liability to pay profits on naval aircraft in excess of the percentage allowable by the Vinson Act, was not entitled to set off the deficiency in profit on the Air Force contract.

The question here is whether the Vinson Act, as amended, permits the setoff taken by petitioner of deficiency in profit incurred in an Air Force aircraft contract against excess profit realized in naval aircraft contracts. Petitioner makes an alternative argument that the Vinson Act, as amended, would permit it to set off against the excess profits realized on its naval aircraft contracts, the deficiency in profit incurred in its naval vessel contract.

The respondent contends that the three categories of contracts, i. e., naval vessel, naval aircraft, and Air Force aircraft, must be treated separately under the provisions of the Vinson Act, as amended, and that the regulations promulgated thereunder [4] prohibit lateral setoffs among the different categories of contracts. The petitioner admits that the regulations of the respondent prohibit such setoffs but contends that the statutes, rightly interpreted, permit such setoffs and the regulations are unreasonable and inconsistent with the statutes and contrary to the intent of Congress in enacting the profit-limiting provisions of the Vinson Act, and the amendments thereto.

Since the sole question here is one of statutory interpretation, we will give a short history of the pertinent sections of the statute involved. The original Vinson Act, at 48 Stat. 503, 505 (1934), provided, in part, as follows:

SEC. 3. The Secretary of the Navy is hereby directed to submit annually to the Bureau of the Budget estimates for the construction of the foregoing vessels and aircraft; * * * *Provided*, That no contract shall be made by the Secretary of the Navy for the construction and/or manufacture of any complete naval vessel or aircraft, or any portion thereof, herein, heretofore, or hereafter authorized unless the contractor agrees—

\* \* \* \* \* \* \*

---

[4] T. D. 4906, 1939–2 C. B. 404, and T. D. 4909, 1939–2 C. B. 422.

(b) To pay into the Treasury profit, as hereinafter provided shall be determined by the Treasury Department, in excess of 10 per centum of the total contract *price*, such amount to become the property of the United States: *Provided*, That if such amount is not voluntarily paid the Secretary of the Treasury may collect the same under the usual methods employed under the internal revenue laws to collect Federal income taxes. [Emphasis supplied.]

It is clear that under the above law contractors who had contracts for the construction of naval vessels and naval aircraft would have to pay into the Treasury all profit in excess of 10 per cent on each contract. There would be no setoff as between contracts for naval vessels or naval aircraft nor between two or more contracts for naval vessels or two or more contracts for naval aircraft. Since the law provided that the profit on each contract had to be computed separately and the excess profit paid on each contract, setoffs as between any two or more contracts were explicitly not allowed.

In 1936 Congress amended section 3 (b) above (Act of June 25, 1936, ch. 812, 49 Stat. 1926) to read as follows:

Sec. 3. * * *

(b) To pay into the Treasury profit, as hereinafter provided shall be determined by the Treasury Department, in excess of 10 per centum of the total contract *prices, of such contracts within the scope of this section as are completed by the particular contracting party within the income taxable year,* * * * *Provided*, That if there is a net loss on *all such contracts* or subcontracts completed by the particular contractor or subcontractor within any income taxable year, such net loss shall be allowed as a credit in determining the excess profit, if any, for the next succeeding income taxable year: * * * [Emphasis supplied.]

In amending section 3 (b) in 1936, the Naval Affairs Committee, in H. Rept. No. 1163, 74th Cong., 2d Sess. (1936), reported as follows:

Under the law today, the excess profits are determined on each individual contract. This bill provides for the determination of such excess profit on the basis of 1 income-taxable year. It is felt that under the present law there is a tendency on the part of contractors to unduly increase their prices in order to insure that they would receive a profit of not less than 10 percent on their contracts; also, as the determination of profits is on the basis of the individual contract, the contractors could not, as would be the procedure under ordinary business practice, recoup actual losses under subsequent contracts owing to the 10-percent limitation of their profit on each contract. It is realized that with strong competition some contractors may, in working up bids for Navy contracts, figure too closely and thus lose money in executing these contracts. In order that such contractors may not be too severely penalized on such contracts, it is proposed to liberalize the present law by allowing them to count 1 year in which to determine their excess profits and at the same time to allow them to credit the net loss, if any, incurred on Navy contracts subject to the act, in an income-taxable year against excess profits in the next succeeding taxable year.

The Senate Report on H. R. 5730, S. Rept. No. 1975, 74th Cong., 2d Sess. (1936), had this explanation:

H. R. 5730 as it passed the House of Representatives amends section 3 (b) in certain parts which has the following effects:

(a) Instead of having the profit computed on each individual contract and making refund, if required, contracts with any one company [are] aggregated for the entire taxable year and refund is made if the company has realized over 10 percent profit on the total of the contracts.

It thus appears from a reading of the words added to the Vinson Act by the Act of 1936, that Congress specifically provided that all contracts should be aggregated for the purpose of computing profit and applying the profit limitation, and they were not to be divided into categories of aircraft and vessel contracts. The words added clearly allowed setoffs of all contracts within the scope of the Act. See *Douglas Aircraft Co.*, 46 B. T. A. 1025.

We think the reasoning behind this particular amendment, as stated by the committee report, is of interest. It was felt that to force a contractor to compute and pay excess profit on the basis of gain or loss on each individual contract without regard to gain or loss on other such contracts within the same year, was contrary to normal business practice. Relief was thereby proposed and passed in the form of an amendment to allow the contractor, in the words of the Naval Affairs Committee, to determine "such excess profit on the basis of 1 income-taxable year." Thus, Congress expressed a desire to place a yearly over-all profit limitation on all contracts that are within the scope of the Act performed by one contractor. Congress, in effect, stated that such a contractor could offset gains on some contracts by losses or deficiencies in profit in others, without distinction between naval vessel and naval aircraft contracts.

We note here that, as of the amendment of 1936, the same percentage of profit and the same carryover provisions were applicable to both naval vessels and naval aircraft. Therefore, there was no reason why the types of contracts should be listed separately in the Act. It is significant that the Treasury Department recognized that Congress intended that contractors be allowed to compute any excess profit on all such contracts whether they were for naval vessel or naval aircraft on the basis of 1 taxable year and approved T. D. 4723, 1937–1 C. B. 519, to that effect on December 31, 1936.

This brings us to the National Defense Act of 1939, which is the critical Act, insofar as the instant case is concerned. It is to be observed that prior to 1939, only naval vessel and naval aircraft contracts had been subject to the profit limitations of the Vinson Act. The National Defense Act of 1939 made Army, now Air Force, aircraft contracts subject to the provisions of the Vinson Act and also made some changes in percentages of profit allowed and some changes in the carryover provisions. This is the Act, according to the respondent, which provides that excess profit on each group of contracts must be computed and paid completely separate and apart from other groups. Let us examine just what the Act did.

First of all, section 14 of the National Defense Act of 1939 applied the profit-limiting features of the Vinson Act to Army aircraft contracts as follows:

SEC. 14. All the provisions of section 3 of the Act of March 27, 1934, as amended (48 Stat. 505; 49 Stat. 1926), and as amended by this section shall be applicable with respect to contracts for aircraft or any portion thereof for the Army to the same extent and in the same manner that such provisions are applicable with respect to contracts for aircraft, or any portion thereof for the Navy: *Provided,* That the Secretary of War shall exercise all functions under such section with respect to aircraft for the Army which are exercised by the Secretary of the Navy with respect to aircraft for the Navy: * * *

Then following the above, section 14 of the National Defense Act of 1939 also further amended section 3 (b) of the Vinson Act. The pertinent parts of the section as amended through 1939, and as in effect during our taxable year, are set out in the margin.[5] The parts added by the amendment of 1939 are italicized for clarity.

The respondent in his brief contends that the Vinson Act as amended in 1939 "expressly preserves the distinction between vessel contract excess profits and aircraft contract excess profits." We note here the distinction could not have been preserved as no such distinction had been previously made. If such distinction is present after the amendment of 1939, it had to be created by that amendment and not preserved.

Pursuant to, and in furtherance of, respondent's construction that each category of contracts, i. e., naval vessels, naval aircraft, and Army aircraft, must be treated separately, the Treasury Department, on June 16, 1939, approved T. D. 4906, 1939–2 C. B. 404, with reference to naval vessels and naval aircraft contracts, and T. D. 4909, 1939–2 C. B. 422, with reference to Army aircraft contracts. These regulations, which are now under attack, clearly require separate computation and payment of excess profit for each of the three so-called cate-

---

[5] SEC. 3. * * *

(b) To pay into the Treasury profit, as hereinafter provided shall be determined by the Treasury Department, in excess of 10 per centum of the total contract prices *for the construction and/or manufacture of any complete naval vessel or portion thereof, and in excess of 12 per centum of the total contract prices for the construction and/or manufacture of any complete aircraft or portion thereof,* of such contracts within the scope of this section as are completed by the particular contracting party within the income taxable year, such amount to become the property of the United States, but the surety under such contracts shall not be liable for the payment of such excess profit: *Provided,* That if there is a net loss on all such contracts or subcontracts *for the construction and/or manufacture of any complete naval vessel or portion thereof* completed by the particular contractor or subcontractor within any income taxable year, such net loss shall be allowed as a credit in determining the excess profit, if any, for the next succeeding income taxable year, *and that if there is a net loss, or a net profit less than 12 per centum, as aforesaid on all such contracts or subcontracts for the construction and/or manufacture of any complete aircraft or portion thereof completed by the particular contractor or subcontractor within any income taxable year, such net loss or deficiency in profit shall be allowed as a credit in determining the excess profit, if any, during the next succeeding four income taxable years, and that the method of ascertaining the amount of excess profit, initially fixed upon shall be determined on or before June 30, 1939:*

gories of contracts: i. e., naval vessel, naval aircraft, and Army (Air Force) aircraft contracts.

Petitioner contends that the amendment of 1939 served only to bring in the Army aircraft contracts and to apply different percentages of allowable profit and different carryover provisions to contracts for vessels and contracts for aircraft, and that Congress did not intend to make further distinctions. While it is true that there are different provisions for vessels and for aircraft, this cannot be said of naval aircraft and Army aircraft. The provisions applied to both are identical in every respect.

The provisions of section 14 of the National Defense Act of 1939, bringing Army aircraft contracts under the provisions of the Vinson Act, certainly indicate in no way that there was to be any distinction between the treatment of naval and Army aircraft contracts. It was stated that all of the provisions of section 3 of the Vinson Act of 1934, as amended in 1936, and as further amended in 1939, should apply to Army aircraft contracts "to the same extent and in the same manner" that such provisions are applicable to naval aircraft contracts. Thus it is as if the section as amended had read, insofar as aircraft contracts are concerned, as follows: "*Provided*, That no contract shall be made by the Secretaries of Navy and War for the construction and/or manufacture of any complete aircraft, or any portion thereof * * * unless the contractor agrees—(b) To pay into the Treasury profit * * * in excess of 12 per centum of the total contract prices * * * of such contracts within the scope of this section * * *."

The National Defense Act of 1939 amendment first places the Army aircraft contracts in the Vinson Act, which already included the naval aircraft contracts and thereafter, in the specific amendment of the subsection (3 (b)), which has to do with how the profits on all contracts shall be computed, makes no further separate mention of naval or Army aircraft contracts. The references are to "the total contract prices for the construction * * * of any complete aircraft," and "such [aircraft] contracts within the scope of this section," or, in the carryover provisions, "all such contracts * * * for the construction * * * of any complete aircraft." Surely there is nothing in this language which would warrant a regulation providing for separate computation of profits between naval and Air Force aircraft contracts. The statute is perfectly plain. It limits the contractor to 12 per cent profit on all of his aircraft contracts completed in 1 year. It accomplishes this by providing the contractor must pay into the Treasury "profit, * * * in excess of 12 per centum of the total contract prices for the construction * * * of any * * * aircraft * * * completed by the particular contracting party within the income taxable year * * *." We see nothing ambiguous in the statute. It is perfectly consistent with the expressed legislative intent of the

statute Congress was amending, namely, the Vinson Act, with its 1936 amendment, which had eliminated the categories of naval vessel and naval aircraft and allowed a single contractor with both contracts to offset the gain on one by the loss on the other. The amendment of 1939, treating all aircraft contracts as a group for the 12 per cent limitation of profit, was merely further recognition of that which Congress expressed in 1936, to wit: That contractors may not be too severely penalized and they be allowed to figure their profit on all of their contracts on a taxable year basis. In fact, an examination of the 1936 law and the 1939 amendment shows that the very language by which offsets were allowed for all contracts then under the Vinson Act by the 1936 law was preserved in the 1939 amendment.

The contention of petitioner that the only reason vessel and aircraft contracts were separated in section 3 (b), as amended in 1939, was because of differences in percentages of allowable profit and carryover provisions, is strengthened by the Act of June 28, 1940, ch. 440, 54 Stat. 676. This Act was approved June 28, 1940, and terminated by its own provisions on June 30, 1942. While this Act was not in effect during our taxable year, we feel that it provides a valuable clue to the thinking of Congress on the instant issue. Section 2 (b) (1) of this Act provides, as follows:

SEC. 2. * * *

(b) After the date of approval of this Act no contract shall be made for the construction or manufacture of any complete naval vessel or any Army or Navy aircraft, or any portion thereof, under the provisions of this section or otherwise, unless the contractor agrees, for the purposes of section 3 of the Act of March 27, 1934 (48 Stat. 505; 34 U. S. C. 496), as amended—

(1) to pay into the Treasury profit in excess of 8 per centum (in lieu of the 10 per centum and 12 per centum specified in such section 3) of the total contract prices of such contracts within the scope of this subsection as are completed by the particular contracting party within the income taxable year;

For the first time since the 1936 amendment, percentages of allowable profit for all contracts were made identical, and it is obvious from a reading of the 1940 amendment that, for the purpose of computing and paying excess profit, no distinctions were to be made as to categories of contracts. Thus, we think, Congress reiterated the feeling that contractors should be allowed to compute gain or loss on a "one taxable-year" basis taking into consideration all of the contracts coming within the scope of the Vinson Act.

It is also noted with regard to the above amendment of 1940, that the carryover provisions of section 3 (b), as amended in 1939, were left undisturbed. In other words, such provisions remained separate for aircraft and vessels because the provisions for each were different. The Treasury Department, nevertheless, recognized the clear intent of Congress to allow setoffs within a taxable year and on July 29, 1940, approved T. D. 5000, 1940–2 C. B. 397, to this effect. Of course

T. D. 5000, *supra*, was only in effect until June 30, 1942, when the Act of 1940 expired, at which time the regulations now under attack were to come back into effect.

To summarize the evolution, or congressional history, of the Vinson Act, we think the one most important clue to the intent of Congress is found in the words used in the amendment contained in the Act of 1936, and the committee report pertaining thereto. The words intended, without doubt, to allow setoffs within a taxable year, were that the contractors agree to pay profit in excess of a certain percentage of the total contract "prices, * * * of such contracts within the scope of this section as are completed * * * within the income taxable year." These identical words can be found in the amendment of 1939 and also in the amendment of 1940. In 1936, respondent admits that the words permit setoffs among all contracts; in 1939, the respondent contends that setoffs among categories of contracts are not permitted; and in 1940, respondent again admits that the words permit setoffs among all categories of contracts. We see no reason why the same language should be given different meanings in the three statutes.

Much of respondent's brief is devoted to the argument that his regulations are interpretive and since they were promulgated practically contemporaneously with the statute (December 1939) and have had long standing application, they are entitled to great weight.

The rule according great weight to contemporaneous and long standing, interpretive regulations, construing a statute, applies only in cases of ambiguity in the statute. All courts recognize that an administrative interpretation of a taxing statute by a Treasury regulation is an appropriate aid to the construction of a statute that uses doubtful language or ambiguous terms. But it is just as true that resort to interpretive Treasury regulations is unnecessary when the tax statute employs plain and unambiguous language. In *Busey* v. *Deshler Hotel Co.*, 130 F. 2d 187, 190, the rule is stated:

Where the language of a taxing statute is plain and unambiguous, there is no occasion for resort to interpretative promulgations of the Treasury Department. Neither the administrative officers nor the courts may supply omissions or enlarge the scope of the statute. See Iselin v. United States, 270 U. S. 245, 250, 251, 46 S. Ct. 248, 70 L. Ed. 566.

Respondent, in order to invoke the "long standing regulation" rule, argues generally that the statute is ambiguous but he points to no language in the statute that is ambiguous or of doubtful meaning. The statute in plain language tells a contractor that he must agree to pay back the profit in excess of 12 per cent of the total contract prices for the construction of any aircraft. Respondent, by his regulations, interprets such language as meaning the contractor must pay back the profit in excess of 12 per cent of the total contract prices for the

performance of naval aircraft contracts and 12 per cent of the total contract prices for the performance of Army aircraft contracts. We can find nowhere in the statute a phrase, a clause, or even any language which would give rise to a justified implication, that would authorize respondent to prescribe by regulation that the profit limitation was to be computed separately for naval aircraft and Army aircraft contracts.

The long standing regulation argument advanced by respondent is somewhat weakened by other factors. To begin with, as earlier pointed out, respondent both before and after the 1939 amendment interpreted similar language in other statutes as authorizing lateral setoffs. Then, too, the statute we are now considering and the respondent's regulations were suspended for different periods of time. They had no application as to contracts entered into after June 28, 1940, and before July 1, 1942. See sec. 26.20 of T. D. 5000, *supra*. This was while the amendment of June 28, 1940, was in force. Before the latter amendment expired by its terms, Congress had enacted the Act of October 8, 1940, ch. 757, 54 Stat. 974, 1003, which is the Second Revenue Act of 1940. Section 401 of this Act suspended the profit-limiting provisions of the Vinson Act as to contracts "entered into in any taxable year to which the excess profits tax provided in subchapter E of chapter 2 of the Internal Revenue Code is applicable." This suspension of the Vinson Act lasted until section 122 (a) of the Revenue Act of 1945, which repealed subchapter E of chapter 2 of the Internal Revenue Code as of December 31, 1945.

Just how much application respondent's regulations have had is something we do not know. One could theorize that there might not be so many taxpayers in the position to attack the portions of the regulations here involved. It would take a contractor with either Air Force and naval aircraft or naval vessel and aircraft contracts in which the profit experience in 1 year was much like petitioner's to make the challenge. Whether there were many or few in that position during the years the statute was in force prior to 1950, we do not know.

Here respondent cannot even justify the regulations as being in furtherance of any congressional intent. The legislative history, as shown by the committee reports accompanying the 1936 amendment, shows the congressional intent to limit profit on the total of *all contracts*, coming within the scope of the Vinson Act, completed in 1 year, by one contractor. The very purpose of the 1936 amendment was to avoid the harsh consequences of the original Vinson Act where the profit had to be computed on each contract. As stated in the H. Rept. No. 1163, *supra*, it was to "liberalize" the original Vinson Act so that the contractors would not be "too severely penalized." And the language which respondent admitted allowed lateral setoffs under the 1936 amendment was preserved in the 1939 amendment involved here.

After much consideration we hold that the instant regulations, insofar as they prohibit taxable year setoffs among aircraft contracts for naval aircraft and Air Force aircraft contracts, are clearly contrary to the intent of Congress, as evidenced by section 3 (b) of the Vinson Act, as amended.

In some ways petitioner's alternative argument, that the statute permits petitioner to set off against excess profits on naval aircraft contracts, the deficiency in profit sustained on the naval vessel contract, is stronger than the argument that setoffs are permitted as beween naval and Air Force aircraft contracts. What petitioner contends in the alternative argument was exactly what was permitted under the 1936 Act and there just is no language in the 1939 Act indicating such setoffs were to be denied thereafter. But we need not decide this issue. It is enough to conclude that the statute permits the setoff taken by petitioner against the excess profit it realized from naval aircraft contracts, of the deficiency in profit it incurred in the Air Force aircraft contract.

*Decision will be entered for the petitioner.*

